IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: * | Chapter 7 |
| LORITA Y. FREELAND, * | Case No.: 1-05-bk-000194MDF |
|     Debtor * | |
| * | |
| LORITA Y. FREELAND, * | |
|     Movant * | |
| * | |
| v. * | |
| * | |
| PENNSYLVANIA CENTRAL FEDERAL * | |
| CREDIT UNION, * | |
|     Respondent * | |

## OPINION

### Factual and Procedural History

The proceeding before me requires me to decide whether a "dragnet clause" in a loan agreement is effective to secure a debt for credit card charges made after the loan agreement was executed. As I will discuss below, I conclude that the dragnet clause involved in the instant case was effective.

In February 2001, Lorita Y. Freeland ("Debtor") executed a "Loanliner Application and Credit Agreement" ("Loanliner") with Pennsylvania Central Federal Credit Union ("PCFCU") in order to obtain the funds to purchase a 2000 Oldsmobile Intrigue. Under the heading "Security Interest," the Loanliner contained the following provision: "Property given as security under this Plan or for any other loan will secure all amounts you owe the credit union now and in the future." In conjunction with the Loanliner, Debtor also executed an "Open-End Voucher and Security Agreement" ("OEVSA") containing under the heading "What the Security Interest Covers" the following provision: "The security interest secures the advance and any extensions,

1

renewals or refinancings of the advance. It also secures any other advances you have now or receive in the future under the [Loanliner] or any other amounts or loans, including any credit card loan, you owe us for any reason now or in the future, except any loan secured by your principal residence."

Debtor filed the instant chapter 7 petition on January 12, 2005 and received a discharge on May 6, 2005. At the time of her petition, she had two outstanding debts to PCFCU – the loan to purchase the Intrigue and credit card debt. Debtor continued making payments on the secured debt after receiving her discharge, but she eventually defaulted on the loan. At some point thereafter, PCFCU repossessed the vehicle. Debtor filed the motion now before me to compel PCFCU to return the vehicle and to impose sanctions on account of the repossession.

Debtor's motion indicates that she has placed in trust with her bankruptcy counsel the sum of $2,200.00 to pay in full the balance remaining on the purchase money loan for the vehicle. PCFCU's answer to the motion indicates that while that sum would be sufficient to pay off the vehicle loan, PCFCU's repossession and retention of the Intrigue is proper because $2,200.00 is not sufficient to pay off the vehicle loan and the credit card balance. Debtor admits on the schedule of unsecured debts filed with her petition that she has a credit card debt to PCFCU in the amount of $5,476.00. PCFCU maintains that its loans are "cross collateralized" it will continue to be secured by the Intrigue until the balance on Debtor's credit card is paid. Debtor denies that the instruments executed by her were sufficient to secure the credit card debt with her vehicle.

A hearing was held in this case on May 14, 2007, and the parties were given seven days to file briefs in support of their respective positions. On May 23, 2007, I issued an Order

2

Case 1:05-bk-00194-MDF    Doc 26    Filed 06/04/07    Entered 06/04/07 14:06:14    Desc
Main Document    Page 2 of 7

denying the motion for contempt. This Opinion is written in support of that Order.

## Discussion

A "dragnet clause" is one that "purport[s] to allow a creditor to secure future advances with previously-pledged collateral." *In re Burkett*, 295 B.R. 776 (Bankr. W.D. Pa. 2003). Pennsylvania courts have found dragnet clauses to be valid and enforceable if the later advances were related to the purposes of the original loan agreement. *Potomac Coal Co. v. $81,961.13 in the Hands of an Escrow Agent,* 451 Pa. Super 289, 679 A.2d 800, 804 (1996). The purpose of the original financing is to be determined from the intent of the parties. *Id.* 629 A.2d at 803. "The 'relatedness rule' is not literally a requirement of the [Uniform Commercial Code] but rather appears as a judicially engrafted doctrine which developed prior to the UCC . . . having little theoretical justification other than some unarticulated public policy rationale." *In re Sunshine Books Ltd.,* 41 B.R. 712, 714 (Bankr. E.D. Pa. 1984).[1]

The Courts have created a four-part test to determine whether a subsequent loan is "related to" a prior loan for purposes of a dragnet clause contained in the prior loan agreement.

---

[1]In June 2001, only a few months after the loan agreement now at issue was executed, Pennsylvania adopted amendments to the Uniform Commercial Code ("UCC") that abrogated the "relatedness" requirement. The comments to the UCC as adopted by Pennsylvania and codified at 13 P.S. § 9204 state that "collateral may secure future as well as past or present advances, if the security agreement so provides. . . . Indeed, the parties are free to agree that a security interest secures any obligation whatsoever. . . . This Article rejects the holdings of cases decided under former Article 9 that applied [ ] tests, such as whether a future advance or other subsequently incurred obligation was of the same or a similar type or class as earlier advances and obligations secured by the collateral." 13 Pa.C.S.A. § 9204, comment 5. The comment following the statutory text set forth in 13 Pa.C.S.A. § 9204 further states that the holdings of cases imposing a relatedness requirement are "abrogated by this section." However, because the instant agreement was executed before the UCC amendments became effective, the relatedness rule must be applied in this case.

3

> "(1) Whether the other indebtednesses allegedly covered by the . . . [security agreement containing said dragnet clause] are [specifically expressed] therein . . . ; (2) Whether the other indebtednesses allegedly covered are 'of the same class' as the debt referenced in the . . . [security agreement] . . . ; (3) Whether the other indebtednesses were intended to be separately secured . . . ; and (4) Whether the . . . [secured party] relied on the clause in making further loans . . . ."

*In re Fassinger,* 246 B.R. 513, 521 -522 (Bankr. W.D. Pa. 2000) (abrogated by 13 Pa.C.S.A. § 9204), *see also Burkett*, 295 B.R. at 785 (purpose of relatedness requirement is to limit application of dragnet clauses to advances "of the same class as the primary transaction").

      a.     *Is the credit card debt to PCFCU specifically expressed in the agreements?*

As indicated above, the OEVSA provides that in addition to the loan for the vehicle, the security interest "also secures any other advances you have now or receive in the future under the [Loanliner] or any other amounts or loans, *including any credit card loan*, you owe us for any reason *now or in the future*." (Emphasis added.) Debtor's credit card account is not referenced in the OEVSA executed in connection with the vehicle loan because the account did not exist at that time. However, this language clearly contemplates the existence of such an account. Whether that account was created before, concurrently with, or after the Loanliner was executed is not relevant to the inquiry in light of the all-encompassing language of the Loanliner. It is sufficient that the language specifically includes the phrase "credit card loan." Thus, the instant agreement is to be distinguished from the one at issue in *Fassinger*, which did not specify the existence of a credit card loan. Therefore I conclude that the credit card debt to PCFCU is specifically addressed in the OEVSA.

4

> b. *Is the credit card indebtedness "of the same class" as the debt on the Oldsmobile Intrigue?*

"Determining whether the debts were of the same class is not an exact science." *James v. Blackhawk Credit Union (In re James)*, 221 B.R. 760, 764 (Bankr. W.D. Wis. 1998). Generally, for purposes of the test, some courts have limited their inquiry to whether loans were for business purposes or consumer purchases. *See e.g. James*, 221 B.R. at 764, *citing Swanson v. Montello State Bank (In re Hill),* 210 B.R. 1016, 1022 (Bankr.E.D.Wis.1997); *In re Johnson,* 9 B.R. 713, 716 (Bankr. M.D. Tenn. 1981); *In re Phillips,* 161 B.R. 824, 827 (Bankr. W.D. Mo. 1993). If the first loan was a business loan, but the second was for a consumer purchase, then the second loan would not be of the same class as the first. If both the original loan and the subsequent loan were for consumer purchases, then the loans would be considered by these courts to have been in the same class. *Contra, In re Wollin*, 249 B.R. 555, 559 (Bankr. D. Or. 2000) (Court declines to adopt per se test, finding that "a loan to purchase a vehicle differs both in scope and solemnity from the miscellaneous charges typical of a VISA account.") In the instant case, both the vehicle loan and the credit card loans were for consumer purchases.

Given the lack of a consensus in the cases on the definition of "class," and further given the absence of any "same class" requirement expressed within the UCC at the time the Loanliner was executed, I conclude that it is not necessary to conduct an inquiry into the relative "class" of the instant debts beyond the consumer/business distinction. The purpose of the original loan agreement may be found within the four corners of that agreement. The dragnet clause is obviously contained within those corners. Consequently it is apparent that the intent of the parties when they signed the agreement was to create a secured loan in which the collateral given

would also be used to secure any later loans, including "loans" for credit card purchases. Accordingly, I conclude that the loans in the instant case were of the same class.

        *c.*     *Was the Debtor's VISA account with PCFCU intended to be separately secured?*

The OEVSA memorializes the terms of Debtor's VISA account. It was completed in a telephone conversation between Debtor and a representative of PCFCU, and the information contained on it was filled in by PCFCU. It is not signed by Debtor. On the first page of this document, in a section labeled "For Credit Union Use Only," under the heading "Security Offered," PCFCU lists the Intrigue. Debtor included the VISA account on her schedule of unsecured debts, and PCFCU did not file a proof of claim indicating that it was secured by any other item of collateral besides the Intrigue. Moreover, VISA credit card accounts are generally unsecured, and there is no indication in the record that Debtor's VISA was not a garden-variety VISA card (Gold, Platinum and other promotional distinctions among VISA cards notwithstanding). Accordingly, I conclude that Debtor's VISA account with PCFCU was not intended to be separately secured.

        *d.*     *Did PCFCU rely on the dragnet clause in making the VISA loans?*

PCFCU did not offer testimony regarding its reliance on the dragnet clause. Nonetheless, it may be generally inferred that a lending institution relies on the language of the documents that it creates and executes with a borrower; otherwise, there would be no point in creating the document. The language in the Loanliner is not ambiguous but clearly states that any credit card account issued by PCFCU to Debtor, whether currently existing, contemporaneously created or created in the future, would be secured by the Intrigue. Again, the OEVSA also specifically mentions the Intrigue as collateral offered for the VISA account.

Case 1:05-bk-00194-MDF    Doc 26    Filed 06/04/07    Entered 06/04/07 14:06:14    Desc
Main Document    Page 6 of 7

Accordingly, I conclude that PSFCU relied on the dragnet clause in making the VISA loans to Debtor.

It was for all of the above reasons that my Order of May 23, 2007 denying Debtor's motion was issued.

By the Court,

*Mary D. France*
Bankruptcy Judge

Date: June 4, 2007

*This document is electronically signed and filed on the same date.*